# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Sierra Club Northstar Chapter,
Friends of the Boundary Waters
Wilderness, Defenders of Wildlife,
The Wilderness Society, and
Northeastern Minnesotans for
Wilderness,

          Plaintiffs,

    v.

Abigail R. Kimbell, as Chief of the
U.S. Forest Service, and Ed Schafer,
as Secretary of Agriculture,

          Defendants,

and

Minnesota Forest Industries, Inc.,
Minnesota Timber Producers
Association, St. Louis County,
and Lake County,

          Intervenors,

and

Mark Holsten, as Commissioner
of the Minnesota Department of
Natural Resources,

          Amicus Curiae.

**MEMORANDUM OPINION
AND ORDER**
Case No. 07-3160 ADM/RLE

---

Catherine G. Davis, Esq., Brian B. O'Neill, Esq., Richard A. Duncan, Esq., and Peter Hennigan, Esq., Faegre & Benson LLP, Minneapolis, MN, on behalf of Plaintiffs.

David W. Fuller, Esq., Assistant United States Attorney, Minneapolis, MN, on behalf of Defendants Abigail R. Kimbell, as Chief of the U.S. Forest Service, and Ed Schafer, as Secretary of Agriculture.

David R. Oberstar, Esq., Fryberger, Buchanan, Smith & Frederick, P.A., Duluth, MN, on behalf of Intervenors Minnesota Forest Industries, Inc., and Minnesota Timber Producers Association.

Barbara A. Russ, Esq., Assistant St. Louis County Attorney, Duluth, MN, on behalf of Intervenor St. Louis County.

Laura M. Auron, Esq., Assistant Lake County Attorney, Two Harbors, MN, on behalf of Intervenor Lake County.

David P. Iverson, Esq., Assistant Minnesota State Attorney General, St. Paul, MN, on behalf of Amicus Curiae Mark Holsten, as Commissioner of the Minnesota Department of Natural Resources.

---

# I.  INTRODUCTION

On June 30, 2008, the undersigned United States District Judge heard oral argument on the Cross-Motions for Summary Judgment of Defendants Abigail R. Kimbell and Ed Schafer (collectively the "Forest Service") [Docket No. 79]; Intervenors St. Louis and Lake County [Docket No. 66]; Intervenors Minnesota Forest Industries, Inc. and Minnesota Timber Producers Association [Docket No. 81] (all Intervenors are collectively referred to as the "Intervenors"), and Plaintiffs Sierra Club Northstar Chapter, Friends of the Boundary Waters Wilderness, Defenders of Wildlife, the Wilderness Society, and Northeastern Minnesotans for Wilderness (collectively "Plaintiffs") [Docket No. 87].  In their Amended Complaint [Docket No. 48], Plaintiffs challenge the decision by the Forest Service to conduct timber sales and road building in the Echo Trail Area Forest Management Project ("Echo Trail Project" or "Project") in the Superior National Forest.  For the reasons set forth below, the Forest Service's Motion is granted in part and denied in part.  Plaintiffs' Cross-Motion for Summary Judgment is granted as to Count One of the Complaint and denied on the remaining counts.

## II. BACKGROUND[1]

This case arises from Forest Service's decision to implement the Echo Trail Project in the

Superior National Forest.  The Superior National Forest is three million acres of land, water,

rock, and trees in northeastern Minnesota, which includes the Boundary Waters Canoe Area

Wilderness ("Boundary Waters").  Land and Resource Management Plan ("Forest Plan")

(Administrative R. [Docket No. 77]) at 12707-12710.  In 2004, the Forest Service revised the

Superior National Forest Land and Resource Management Plan (the "Forest Plan") to establish

goals and objectives for managing the Superior National Forest for the next ten to fifteen years.

Id. at AR12707.

The Forest Service determined the need for the Echo Trail project after evaluating the

existing conditions in the Project area and comparing those conditions to the desired conditions

and objectives established in the Forest Plan.  Echo Trail Area Forest Management Project,

Record of Decision ("Record of Decision") (Administrative R. [Docket No. 77] at AR8014.  The

Project area comprises approximately 203,700 acres in St. Louis and Lake County, Minnesota.

Id. at AR8014.  Sixty-two percent of the Project area is owned by the National Forest System, a

portion of which borders the Boundary Waters.  Id.  None of the Project area is located within

the Boundary Waters.  Id.  The Forest Plan divides the Superior National Forest into several

different management areas and landscape ecosystems.  Echo Trail Project Final Environmental

Impact Statement ("FEIS") (Administrative R.) at AR7921.  The Echo Trail Project is located in

---

[1] On a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party.  Ludwig v. Anderson, 54 F.3d 465, 470 (8th Cir. 1995).  As both parties and the Intervenors have moved for summary judgment, any disputed facts are noted.

the Jack Pine/Black Spruce Landscape Ecosystem.  Id.  The Forest Service chose the Echo Trail

Project area for management activities because "[t]he jack pine . . . is old and mature and as it

declines, there is concern that the jack pine cover type will be lost to other species."  Id.  The

Forest Service determined that planting new jack pine in the Project area would "contribute to a

Forest Plan desired condition."  Id.  Before preparing the Final Environmental Impact Statement

("FEIS") for the Echo Trail Project, the Forest Service worked with an interdisciplinary team of

specialists in wildlife, biology, forestry, wilderness, timber, ecology, and hydrology.  FEIS at

AR7924, AR7864-7865.  The team developed a packet specifying the need for the Project, its

purpose, and the proposed actions.  Id. at AR7924.  The team distributed the packet to members

of the public, organizations, and agencies, in addition to placing the information online and

distributing it to local and regional newspapers.  Id. at AR7924.  This distribution of information

is referred to as the scoping process.  Id.  Through the scoping process the interdisciplinary team

identified issues of debate that it then addressed in a draft EIS for the Echo Trail Project

("DEIS").  Id. at AR7925.  The Forest Service distributed the DEIS to the public and set a forty-

five day comment period beginning on April 14, 2006.  Id.  The Forest Service received 1200

pieces of correspondence in response to its DEIS.  The Forest Service addressed many of the

comments made in response to the DEIS and made some changes prior to the release of the

FEIS.

In the FEIS, the Forest Service considered four management alternatives, including a no-

action alternative.  Id. at AR7622.  After reviewing each of the action alternatives, the Forest

Service concluded that each action alternative would advance the objectives and goals of the

Forest Plan.  Id. at AR7626.  In chapter three of the FEIS, the Forest Service evaluated the

physical, biological, and social resources in the Project area that might be affected by the three action alternatives and the direct, indirect, and cumulative effects that the three action alternatives might have on those resources. Id. at AR7647. Ultimately, the Forest Service decided to implement the third alternative presented in the FEIS. ROD at AR8016. The Forest Service summarized the approved actions as follows:

> the Selected Alternative will include clearcut with reserves, partial cut, and thinning treatments on about 12,701 acres, regeneration (natural or with planting) of stands on 11,922 acres, diversity planting and release work outside harvested areas on 1,280 acres, disposing of about 601 slashpiles, construction and subsequent closure of 74 miles of temporary road, decreasing the National Forest System of roads by 11 miles, decommissioning a total of 35 miles of road, and maintaining 37 gravel pits.

Id.

Plaintiffs initiated an administrative appeal of the Forest Service's decision on March 20, 2007, raising the same issues presented in their Amended Complaint. The Appeal Deciding Officer affirmed the Forest Service's approval of the Echo Trail Project. Plaintiffs now seek relief from this Court. In the Amended Complaint, Plaintiffs assert five Counts against the Forest Service. Plaintiffs have voluntarily dismissed Count Four with prejudice leaving four counts in dispute. Plaintiffs argue that the Forest Service's analysis in its FEIS fails the requirements articulated in the National Environmental Policy Act ("NEPA"), the Wilderness Act, and the National Forest Management Act ("NFMA"). Am. Compl. ¶¶ 87-121. Accordingly, Plaintiffs contend that the Forest Service's approval of the Echo Trail Project is arbitrary and capricious in violation of the Administrative Procedures Act ("APA"). Id.

# III.  DISCUSSION

## A.     Standard of Review

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall issue "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); see Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  The Plaintiffs' claims are subject to judicial review under the APA, which requires a reviewing court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(a).

"The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency."  Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co., 463 U.S. 29, 43 (1983).  In reviewing the agency's explanation for its action, the Court considers "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment."  Id. (internal quotation omitted).  An agency's rule is arbitrary and capricious if it (1) relied on factors Congress did not intend it to consider; (2) "entirely failed to consider an important aspect of the problem"; (3) "offered an explanation for its decision that runs counter to the evidence before the agency"; or (4) "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  Id.

B.        Count I—NEPA Violation Related to Boundary Waters

In Count I of the Amended Complaint, Plaintiffs allege the Forest Service violated NEPA

by failing to take a "hard look" at the impacts of the Echo Trail Project on the Boundary Waters.

NEPA requires an environmental impact statement ("EIS") for "all major Federal actions

significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C).  NEPA

requires an agency to draft an EIS for actions significantly affecting the environment to inform

the public and assure them "that the agency has indeed considered environmental concerns in its

decisionmaking process," and in doing so, provide a springboard for public comment.  Robertson

v. Methow Valley Citizens Council, 490 U.S. 332, 349-50 (1989) (internal quotation and citation

omitted).

NEPA "prohibits uninformed-rather than unwise agency action," and therefore, requires

that the agency take a "hard look" at environmental consequences but does not "mandate

particular results."  Id. at 350-51.  NEPA requires that the agency include in the EIS

consideration of the direct, indirect, and cumulative effects of the project.  NEPA defines a direct

effect as one caused by the action and occurring at the same time and place.  40 C.F.R.

§ 1508.8(a).  An indirect effect is caused by the action and is later in time or farther removed in

distance, but is still reasonably foreseeable.  Id.  NEPA defines a cumulative impact as "the

impact on the environment which results from the incremental impact of the action when added

to other past, present, and reasonably foreseeable future actions . . . . Cumulative impacts can

result from individually minor but collectively significant actions taking place over a period of

time."  40 C.F.R. § 1508.7.

The Council on Environmental Quality has promulgated regulations listing considerations agencies should take into account in fulfilling their obligation to take a "hard look" at environmental impacts.  Heartwood, Inc. v. U.S. Forest Service, 380 F.3d 428, 431 (8th Cir. 2004).  One consideration listed is the "[u]nique characteristics of the geographic area such as proximity to . . . park lands, . . . wild or scenic rivers, or ecologically critical areas."  40 C.F.R. § 1508.27(b)(3).  Because the Echo Trail Project abuts the Boundary Waters, a designated wilderness area, the Forest Service was required to consider impacts on the Boundary Waters in addition to the impacts within the Project area.  Friends of Boundary Waters Wilderness v. Bosworth, 487 F.3d 815, 818 (8th Cir. 2006) (providing background on the Boundary Waters); see also Heartwood, Inc., 380 F.3d at 433 (upholding the Forest Service's determination that a project would have no significant impacts on the environment where the environmental assessment included in its analysis potential impacts to a scenic river that was more than a mile away from the proposed project area).

By a review of the agency's EIS the Court determines "whether the agency has made a good faith effort to consider the values NEPA seeks to protect."  Minn. Pub. Interest Research Group v. Butz, 541 F.2d 1292, 1299 (8th Cir. 1976).  The Eighth Circuit has provided the following guidance for evaluating whether an EIS meets NEPA's requirements:

> The statement must not merely catalog environmental facts, but also explain fully its course of inquiry, analysis and reasoning.  The role of the courts is simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious.  Adequate agency consideration is evidenced through the EIS's form, content, and preparation.  We need not "fly speck" an EIS for inconsequential or technical deficiencies.  Instead, we consider whether the agency's actual balance of costs and benefits was arbitrary or clearly gave insufficient weight to environmental values.

<u>Friends of Boundary Waters Wilderness v. Dombeck</u>, 164 F.3d 1115, 1127-28 (8th Cir. 1999) (internal quotations and citations omitted).

Plaintiffs contend the Forest Service violated NEPA by failing to evaluate the Echo Trail Project's  impacts on the Boundary Waters.  Plaintiffs contention is not that the Forest Service entirely ignored and failed to consider the impacts on the Boundary Waters, but rather that the Forest Service engaged in a selective analysis that falls short of the "hard look" analysis NEPA requires.

### 1.      Water Quality

Plaintiffs contend the FEIS completely fails to consider impacts on water quality in the Boundary Waters despite concluding that there would be some direct and indirect negative effects to water within the Project area, which is adjacent to the Boundary Waters.  Plaintiffs contend the Forest Service's conclusion that there was no need to evaluate impacts on the Boundary Waters because impacts within the Project area would be minimal was without support.  Plaintiffs assert the Forest Service had an obligation to evaluate impacts to water quality within the Boundary Waters, and that by failing to do so, the Forest Service violated NEPA and adopted a project decision that is arbitrary and capricious.

The Forest Service acknowledges the FEIS' conclusion of minimal direct and indirect negative effects to water quality and watershed health in the Project area.  Defs.' Mem. in Supp. of Mot. for Summ. J. [Docket No. 82] at 16.  However, the Forest Service argues that because the Project would have no cumulative impacts on water quality within the Project area, there was no reason to separately examine potential impacts within the Boundary Waters.

The FEIS is tiered to the Forest Plan.  By adhering to the standards set forth for managing the Superior National Forest, which includes the Boundary Waters, the Forest Service necessarily adhered to requirements for management of the Boundary Waters.  Utilizing the standards articulated in the Forest Plan, the Forest Service concluded that the Echo Trail Project would have minimal negative direct and indirect impacts on water quality or watershed health within the Project area.  FEIS at AR7699.  Although the Project created the risk for negative direct and indirect impacts, the Forest Service determined there was no risk of cumulative impacts on water quality and watershed health in the Project area.  FEIS at AR7701.

The FEIS does not assess the Project's impacts on water quality and watershed health in the Boundary Waters.  The fact that the FEIS is tiered to the Forest Plan does not cure this deficiency.  Although the Forest Plan does include a discussion regarding the goals and standards for managing the Boundary Waters, it does not inform the public of the possible impacts to water quality in the Boundary Waters caused by the Echo Trail Project or any other harvesting project.  FEIS at AR7781-AR7820.  An objective of an EIS is to inform and assure the public that the environmental impacts of a proposed action have been fully considered.  The FEIS in this case fell short of fully fulfilling its purpose.

Further, the Forest Service's argument that no analysis of the impacts on water quality in the Boundary Waters was necessary because of its finding that there would be no cumulative impacts in the Project area is without support.  No explanation is provided as to why there would be no direct or indirect negative impacts to the Boundary Waters despite the anticipation of direct and indirect negative impacts in the Project area.  If, as the Forest Service argues, it is reasonable to assume there would be no cumulative impacts to the Boundary Waters because

there would be no such impacts in the Project area, then it also seems reasonable to assume that the presence of direct and indirect negative impacts in the Project area creates some risk of similar impacts in the Boundary Waters.  Even if those risks are minimal, the Forest Service must explain why even slight negative direct and indirect impacts would not result in negative cumulative impacts .  See 40 C.F.R. § 1508.7 ("Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.").  The need for such an explanation is especially great given that there are multiple harvesting projects occurring within the Superior National Forest that may cause minimal impacts on the Boundary Waters, which taken together may give rise to negative cumulative impacts.  By failing to consider the Project's impacts on the water quality and watershed health of the Boundary Waters, the Forest Service failed to conduct the "hard look" analysis required by NEPA.

### 2.      Cumulative Impacts of Other Harvesting Projects

Plaintiffs also allege the Forest Service failed to analyze the cumulative impacts of the Echo Trail Project and other timber harvesting activities on the Boundary Waters.  Specifically, Plaintiffs contend that "[t]o adequately consider the Project's cumulative impacts to the Boundary Waters, the Forest Service must consider the impact of the Project in combination with all other past, present, and foreseeable timber harvests occurring along the edge of the Boundary Waters."  Am. Compl. ¶ 95.  Plaintiffs identify five forest projects (the Tomahawk, Plantation, Little East Creek, Crescent Lake, and Glacier projects) the Forest Service allegedly failed to consider.  The Forest Service responds that Chapter 3 of the FEIS addresses the cumulative impacts of the Tomahawk, Plantation and Little East Creek Projects.  The Forest Service did not

consider the Crescent Lake project relevant to the Echo Trail Project and did not consider the Glacier project's impacts because it had not yet been proposed when the FEIS was drafted.

A review of the record leaves no question that the Forest Service considered other harvesting projects when assessing cumulative impacts of the Echo Trail Project on the Superior National Forest.  For example, in the chapter addressing fire regime condition class, the Forest Service specifically included in the discussion of cumulative impacts a detailed discussion of the Little East Creek project.  FEIS at AR7709.  Other sections of the FEIS similarly include discussions of other harvesting projects, and Appendix I specifically details the harvesting projects the Forest Service considered in analyzing cumulative effects.  Id. at AR7215. Appendix I is more comprehensive than a mere listing of projects, it provides a detailed discussion of the Plantation and Three Bays on Lake Vermilion Projects.  Id. at AR7215-AR7216.  Unlike the Forest Service's discussion of water quality and watershed health, which is limited to the Project area, the Forest Service's analysis of other harvesting projects analyzes impacts to the Superior National Forest, which includes the Boundary Waters.  Accordingly, the Forest Service did consider the cumulative impacts of other harvesting projects on the Boundary Waters.  The Forest Service in the FEIS is not required to specifically discuss each of the projects cited by Plaintiffs.  What is required, is that the FEIS include a thorough and thoughtful consideration of other harvesting projects within the Superior National Forest, which it does. See Minn. Pub. Interest Research Group, 541 F.2d at 1299 (explaining that courts analyze the agency's EIS to determine "whether the agency has made a good faith effort to consider the values NEPA seeks to protect").

The Forest Service also argues that the FEIS utilized data based on vegetation information combined in a comprehensive and sophisticated database referred to as the Combined Data System ("CDS").  The CDS allegedly takes into account the cumulative impacts of other harvesting projects in the Forest because the CDS data is detailed down to the stand level and is updated annually, thus automatically incorporating information about other harvesting projects on Forest land.  Plaintiffs dispute whether use of the CDS data demonstrates consideration of other harvesting projects.  Having already determined that the Forest Service considered the cumulative impacts of other harvesting projects, the Court will not explore the intricacies of the CDS other than to note it is further evidence of a good faith attempt by the Forest Service to uphold the environmental values of NEPA.

### 3.    Invasive Species

Finally, Plaintiffs contend that the Forest Service acknowledged in the FEIS that timber harvesting will contribute to the spread of non-native invasive species ("NNIS") but failed to analyze cumulative NNIS impacts to the Boundary Waters.  The Forest Service asserts that they did consider the impacts of NNIS on the Boundary Waters and determined that it was a lesser risk than that posed by recreation use in the Boundary Waters.

There is no support for the argument that the Forest Service failed to consider the impacts of NNIS on the Boundary Waters.  To the contrary, a review of the FEIS demonstrates that the Forest Service engaged in the requisite discussion of the impacts of NNIS on the Boundary Waters:

> Some who commented during scoping raised the concern that the Echo Trail project would spread NNIS into the BWCAW.  However, the likelihood of NNIS spread into the BWCAW due to project activities is low . . . . NNIS spread in the

> BWCAW is far more likely due to recreational use, which would not change
> under [the Project alternatives].

FEIS at AR7717.

Although the Forest Service properly considered the cumulative impacts of other harvesting projects and NNIS, they did not consider the Project's impacts on water quality and watershed health in the Boundary Waters.  Accordingly, Plaintiffs are entitled to summary judgment on Count One.[2]

### C.       Count Two—Wilderness Act Violation

In Count Two of the Amended Complaint, Plaintiffs allege that "[b]y approving a Project which degrades the wilderness character of the Boundary Waters, the Forest Service violated Section 4(b) of the Wilderness Act, 16 U.S.C. § 1133(b), and its implementing regulations, and the APA, 5 U.S.C. § 706(2)."  Am. Compl. ¶ 99.  "The Wilderness Act of 1964, 16 U.S.C. § 1131-36 (1994), established a national system of preserving and protecting federally held wilderness areas."  <u>Friends of the Boundary Waters Wilderness</u>, 164 F.3d at 1119.  The Forest Service contends that because the Project activities occur outside the wilderness area, it is not subject to the provisions of the Wilderness Act.  The parties dispute the reach of § 4(b) of the Wilderness Act, specifically, whether it regulates actions occurring in adjacent non-wilderness areas.  Section 4(b) provides:

> Except as otherwise provided in this chapter, each agency administering any area
> designated as wilderness shall be responsible for preserving the wilderness

---

[2]  Although the Intervenors filed Motions for Summary Judgment against Plaintiffs, they did not address the Forest Service's failure to analyze impacts to the water quality and watershed health of the Boundary Waters and thus failed to present any evidence demonstrating they are entitled to summary judgment on Count One or that Plaintiffs should be denied summary judgment.

character of the area and shall so administer such area for such other purposes for which it may have been established as also to preserve its wilderness character.

16 U.S.C. § 1133(b).

The plain language of § 4(b) does not distinguish between impacts on the wilderness arising from actions within the protected area or on land adjacent to it. However, § 4(a)(1) states: "Nothing in this chapter shall be deemed to be in interference with the purpose for which national forests are established as set forth in the . . . Multiple-Use Sustained-Yield Act." The Multiple-Use Sustained-Yield Act requires that national forests "be administered for outdoor recreation, range, *timber*, watershed, and wildlife and fish purposes." 16 U.S.C. § 528 (emphasis added). Because there is a tension between the need to preserve the wilderness of the Boundary Waters and the need to conduct timber harvesting activities to manage the Superior National Forest, the Wilderness Act does not impose a *per se* ban on all agency activity having an impact within the wilderness area. See also Izaak Walton League of Am., Inc. v. Kimbell, 516 F. Supp. 2d 982, 989-90 (D. Minn. 2007) (addressing the very question currently before this court). Nonetheless, actions occurring on adjacent non-wilderness lands that have an impact on designated wilderness are regulated by the Wilderness Act.

The crucial issue of the amount of impact an action occurring on adjacent land must have on a designated wilderness area before violating the Wilderness Act need not be decided here. Plaintiffs argue the Forest Service cannot be found to have complied with the Wilderness Act given their failure to analyze the impacts of the Echo Trail Project on the Boundary Waters. Specifically, Plaintiffs raise the issues of NNIS and water quality and watershed health. As already explained, the Forest Service adequately considered the impacts the Echo Trail Project would have on NNIS in the Boundary Waters but failed to consider impacts to water quality or

15

watershed health in the Boundary Waters.  Because the impacts the Echo Trail Project has on the water quality and watershed health of the Boundary Waters has not yet been addressed, the Court is unable to analyze whether the Echo Trail Project's impacts on water quality and watershed health in the Boundary Waters violates the Wilderness Act.  Accordingly, all motions for summary judgment on this claim are denied without prejudice until the Forest Service has amended the FEIS in accordance with this Order.

###    D.    Count III—NEPA Violation Related to Lynx

In Count III of the Amended Complaint, Plaintiffs allege the Forest Service violated NEPA by failing take a hard look at the Project's impacts on lynx conservation and recovery. Am. Compl. ¶¶ 101-104.   NEPA's implementing regulations require the Forest Service to consider "[t]he degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973." 40 C.F.R. § 1508.27.  The Canada lynx is designated as an threatened species.  50 C.F.R. § 17.11.  Accordingly, one of the objectives of the Forest Plan is to "promote a consistent and effective approach to conservation and recovery of Canada lynx on National Forest System land."  Forest Plan App. E-1 at AR11920.  The Forest Service determined it must maintain lynx habitat connectivity to further its goal of conserving and recovering lynx in the Superior National Forest.  See Lynx Strategy (Administrative R. at AR24799).

The Forest Service uses Lynx Analysis Units ("LAUs") to "evaluate and monitor effects of management actions, lynx population status, habitat conditions, and risk factors for lynx on National Forest land."  Forest Plan at AR11923.  LAUs encompass lynx habitat and are the smallest landscape scale analysis units used to determine direct, indirect, and cumulative impacts

on lynx.  The Forest Service analyzes the percentage of canopy cover in LAUs to evaluate

habitat connectivity.  Forest Plan Biological Assessment (Defs.' Ex. [Docket No. 101] Ex. 12) at

112.  "Connectivity refers to vegetation cover in sufficient quantity and arrangement to allow

lynx to easily move long distances in search of food, cover, and mates."  Id. at 111.  The Forest

Service uses adequate canopy cover as an indicator for habitat connectivity.  Id. at 112.

Adequate canopy cover is defined as upland forest greater than four-years old and lowland forest

greater than nine-years old.  Id.  The Echo Trail Project Biological Assessment ("Echo Trail

Project BA") provides the percentage of canopy cover in each LAU within the Project area.

Echo Trail Project BA (Administrative R. at 00007083) at 29.  The Forest Service determined

that "vegetative connectivity for movement across LAUs (indicator 4) is maintained with all

alternatives."  Id. at 36.

Plaintiffs contend, however, that by relying on the percentage of canopy cover within

each LAU without specifically identifying the locations within each LAU that contain the

requisite canopy cover, the Forest Service failed to consider "how the location of the Project's

12,000 acres of harvest could restrict lynx movement and use patterns."  Pls.' Reply Mem. in

Supp. of Mot. for Summ. J. [Docket No. 99] at 6.  The Forest Service contends that they

adequately considered the Project's impacts on lynx and lynx habitat connectivity and thus did

not violate NEPA.

Once again NEPA requires that the Forest Service take a hard look at the environmental

consequences of a proposed project before taking a major action.  Baltimore Gas & Elec. Co. v.

Natural Res. Def. Council, Inc., 462 U.S. 87, 97 (1983).  In analyzing whether the Forest Service

met the hard look requirement the Court determines whether "the agency has adequately considered and disclosed the environmental impact of its actions." Id. at 97-98.

In the Echo Trail Project BA, the Forest Service compared the existing percentage of adequate canopy cover in the individual LAUs within the Project area with the projected percentage of adequate canopy cover under each project alternative. From this comparison the Forest Service determined the impacts the Project would have on adequate canopy cover in the Project area and thus the Project's impacts on lynx habitat connectivity. Plaintiffs offer no evidence that the Forest Service's strategy prevents adequate consideration and disclosure of the impacts of the Project. Although utilizing a map to identify the location of adequate canopy cover within the Project area would be helpful and informative, the Forest Service is afforded discretion in carrying out its duties[3] and Plaintiffs have offered no evidence or legal authority that failure to include a map resulted in a NEPA violation. Further, Plaintiffs have offered no evidence for the proposition that utilizing the percentage of canopy cover as an indicator for habitat connectivity per se results in an arbitrary and capricious decision. Accordingly, Plaintiffs Motion for Summary Judgment on Count Three is denied. A review of the administrative record reveals that the Forest Service considered the Project's impacts to lynx habitat connectivity and that its use of the percentage of adequate canopy cover is supported by sound reasoning. Accordingly, the Forest Service's Motion for Summary Judgement on Count Three is granted.

---

[3]36 C.F.R. § 219.19(a)(1) (1999), which directs agencies regarding the use of management indicator species simply states that "certain vertebrate and/or invertebrate species . . . shall be identified and selected as management indicator species," without indicating that any particular number must be selected. Further, section 219.19(a)(1) provides a list of categories of indicator species and states that "the following categories shall be represented *where appropriate*," and leaves it to the agency to determine which categories are appropriate.

E.      **Count V—NFMA Violation**

The National Forest Management Act ("NFMA") requires the Forest Service to develop "land and resource management plans" for national forests.  16 U.S.C. § 1604(a).  Pursuant to the NFMA, forest plans must further the goals of "diversity of plant and animal communities based on the suitability and capability of the specific land area."  16 U.S.C. § 1604(g)(3)(B).  In furtherance of that goal, the Forest Services is required to monitor management indicator species ("MIS"), "because their population changes are believed to indicate the effects of management activities."  36 C.F.R. §§ 219.19(a)(1) (1999).

In Count Five of the Amended Complaint, Plaintiffs allege the Forest Plan violates the NFMA.  Am Compl. ¶¶ 109-11.  Plaintiffs object to the Forest Service's use of management indicator species ("MIS") on three grounds: (1) Plaintiffs contest the Forest Service's use of four MIS in the Forest Plan and assert that the selected MIS are not bellwethers for other species in the Superior National Forest; (2) Plaintiffs argue that the Forest Service cannot cure the failure to consider an adequate number of MIS by their use of management indicator habitats ("MIH"); and (3) Plaintiffs contend that by failing to utilize an adequate number of MIS, the Forest Service rendered meaningless its obligation to monitor the population trends of MIS.

The Forest Service contends that the NFMA does not prescribe a specific number of MIS that must be included in the Forest Plan nor does the NFMA dictate what categories of species the MIS represent.  Further, the Forest Service argues that they do not use MIH in lieu of MIS but rather the MIH compliment their assessment on wildlife diversity in the Superior National Forest.  Accordingly, the Forest Service contends that their use of the MIS selected in the Forest Plan, supported by the additional assessment of MIH, satisfies NFMA requirements.

Plaintiffs fail to demonstrate why the use of four MIS is arbitrary and capricious. Contrary to Plaintiffs' assertions, the Forest Service's decision to substantially decrease the number of MIS used in the 2004 Forest Plan is not, by itself, evidence of an arbitrary action. See 36 C.F.R. 219.19 (leaving the number and type of MIS to the discretion of the Forest Service). Further, Plaintiffs fail to explain why the four MIS used by the Forest Service cannot serve as bellwethers for other species in the Superior National Forest. Similarly, Plaintiffs fail to address why the Forest Service cannot use MIH to compliment its analysis of MIS.

A review of the Forest Plan reveals a thorough and reasoned explanation for the selection of the MIS used in the Forest Plan and subsequent FEIS and the reasons for using MIH to compliment the Forest Plan's analysis of MIS. Forest Plan FEIS (Administrative R.) at AR11203, AR11305, AR11317, AR11360, AR11371. Accordingly, the Forest Service's decision regarding the number of MIS, the selection of MIS, and the use of MIH was neither arbitrary nor capricious. As such, the Forest Service is entitled to summary judgment on Count Five.[4]

### F.    Relief

By failing to consider the Project's impacts on water quality and watershed health within the Boundary Waters, the Forest Service failed to take a hard look at the Project's impacts as required by NEPA. As a result, the adoption of the Project based on the FEIS was arbitrary and capricious. Accordingly, the FEIS is vacated and the Forest Service is ordered to amend the FEIS to include an analysis of the Project's impacts to water quality and watershed health in the

---

[4] Because the Court grants the Forest Service summary judgment on Counts Two, Three, and Five, the Intervenors Motions for Summary Judgment on these Counts are denied as moot.

Boundary Waters.  The FEIS is comprehensive and thoughtful and presents a great deal of information.  Accordingly, it is quite likely that the Forest Service already has the information necessary to address the Project's impacts on the Boundary Waters.  To comply with NEPA's "hard look" analysis regarding the Project's impacts to water quality within the Boundary Waters, the Forest Service must explain whether the Project will have any direct, indirect, or cumulative  impacts on the Project area and how it arrived at its conclusion.  Until the Forest Service amends the FEIS as ordered, it is enjoined from implementing the Echo Trail Project.

## IV.  CONCLUSION

Based on the foregoing, and all the files, records and proceedings herein, **IT IS**

**HEREBY ORDERED** that:

1.　　Plaintiffs Sierra Club Northstar Chapter, Friends of the Boundary Waters

Wilderness, Defenders of Wildlife, the Wilderness Society, and Northeastern

Minnesotans for Wilderness (collectively "Plaintiffs") Motion for Summary

Judgment [Docket No. 87] is **GRANTED** as to Count One of Plaintiffs'

Amended Complaint [Docket No. 48] and **DENIED** as to Counts Two, Three,

and Five;

2.　　Defendants Abigail R. Kimbell and Ed Schafer's Motion for Summary Judgment

[Docket No. 79] is **DENIED** as to Count One of Plaintiffs' Amended Complaint

and **GRANTED** on Counts Two, Three, and Five; and,

3.　　Intervenors St. Louis and Lake County and Intervenors Minnesota Forest

Industries, Inc. and Minnesota Timber Producers Association's Motions for

Summary Judgment [Docket Nos. 66, 81] are **DENIED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

　　　　　　　　　　　　　　　　　　BY THE COURT:


　　　　　　　　　　　　　　　　　_____s/Ann D. Montgomery_____
　　　　　　　　　　　　　　　　　ANN D. MONTGOMERY
　　　　　　　　　　　　　　　　　U.S. DISTRICT JUDGE

Dated:  September 15, 2008.